IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

DUBLIN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR 309-014 |
| | ) | |
| MICHAEL LAWTON DOUGLAS, JR. | ) | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

In the above-captioned criminal case, the government has charged Defendant Michael Lawton Douglas, Jr. ("Defendant"), and two co-defendants with two counts of Conspiracy in relation to paying voters to vote in the 2004 Dodge County election cycle; Defendant is also charged with four counts of Vote Buying. (Indictment, doc. no. 3). The matter is now before the Court on Defendant's "Motion to Dismiss," in which he argues that one of the charging statutes in this case, 42 U.S.C. § 1973i(c), does not apply to the vote buying alleged in this case; he further argues that even if § 1973i(c) does apply, such an application is unconstitutional.[1] (Doc. no. 40). The government opposes Defendant's motion. (Doc. no. 58). For the reasons developed below, the Court **REPORTS** and **RECOMMENDS** that the motion be **DENIED**.

I.  **BACKGROUND**

The above-captioned prosecution stems from actions allegedly taken by Defendant

---

[1] Defendant has also filed a reply brief in support of his motion in which he primarily focuses on his argument that the application of the statute is unconstitutional. (Doc. no. 72).

and others to buy votes and to vote more than once in a primary election on July 20, 2004, and a primary runoff election on August 10, 2004. (Doc. no. 3). Although voters were casting votes for the Sheriff of Dodge County during these two elections, both elections were also held, in part, to elect persons to federal office, namely, to the United States Senate and to the United States House of Representatives. (Id.). The indictment alleges a conspiracy between Defendant and his two co-defendants as to each election (Counts One and Four), along with four substantive counts of vote buying, in violation of 42 U.S.C. § 1973i(c) (Counts Two, Three, Five, and Six). As succinctly described by Defendant in a separate motion to dismiss, each charged conspiracy is identical but for the time frame involved, and each count alleges two objects: "One object of the conspiracy was to buy votes, in violation of 42 U.S.C. § 1973i(c). The other supposed object of these conspiracies was to engage in multiple voting, in violation of 42 U.S.C. § 1973i(e)." (Doc. no. 41, p. 2).[2] All told, then, each count of the indictment alleges either a conspiracy or a substantive violation of § 1973i(c).

According to Defendant, § 1973i(e) does not apply to vote buying in state or local elections, but even if it does, "such an application violates the Constitution. As a result, even accepting all the facts alleged in the indictment, this Court lacks jurisdiction." (Doc. no. 40, p. 1). The government counters that Defendant's arguments "have been squarely rejected by every single [c]ourt that has considered them, including the Eleventh Circuit . . . twice." (Doc. no. 58, pp. 1-2 (citations omitted)). The government has the better argument.

---

[2]This second motion to dismiss is the subject of a separate Report and Recommendation. (See doc. no. 82).

## II. DISCUSSION

### A. Charging Statute Applies to Vote Buying Alleged in this Case.

Challenges to an indictment, including a claim that the indictment fails to invoke the court's jurisdiction or to state an offense, may be raised pursuant to Fed. R. Crim. P. 12(b)(3)(B). As the Eleventh Circuit has explained, dismissal under this portion of Rule 12(b) may be had if "there is an infirmity of law in the prosecution. . . ." United States v. deVegter, 198 F.3d 1324, 1326 (11th Cir. 1999) (quoting United States v. Torkington, 812 F.2d 1347, 1354 (11th Cir. 1987)). A court may not, however, grant dismissal if "the factual allegations in the indictment, when viewed in the light most favorable to the government, [are] sufficient to charge the offense as a matter of law." United States v. Sharpe, 438 F.3d 1257, 1258-59 (11th Cir. 2006).

Here, the indictment charges that in the 2004 Dodge County election cycle, a primary election was held on July 20, 2004, and a primary runoff election was held on August 20, 2004; during both of these elections, voters were voting not only on candidates for the position of Dodge County Sheriff, but also on candidates for the United States Senate and the United States House of Representatives. (Doc. no. 3). Thus, the events described in the indictment occurred in a so-called "mixed federal-state election." The charging statute challenged by Defendant, 42 U.S.C. § 1973i(c), provides:

> (c) False information in registering or voting; penalties
>
> Whoever knowingly or willfully gives false information as to his name, address or period of residence in the voting district for the purpose of establishing his eligibility to register or vote, or conspires with another individual for the purpose of encouraging his false registration to vote or illegal voting, or pays or offers to pay or accepts payment either for

3

> registration to vote or for voting shall be fined not more than $10,000 or imprisoned not more than five years, or both: *Provided, however*, That this provision shall be applicable only to general, special, or primary elections held solely or in part for the purpose of selecting or electing any candidate for the office of President, Vice President, presidential elector, Member of the United States Senate, Member of the United States House of Representatives, Delegate from the District of Columbia, Guam, or the Virgin Islands, or Resident Commissioner of the Commonwealth of Puerto Rico.

Despite the language of the statute making the prohibition against vote buying applicable to "elections held solely or in part" for the purpose of electing federal candidates, Defendant persists in his argument that there is no federal jurisdiction over the vote buying described in the instant indictment that allegedly occurred in a contest for the office of local Sheriff. He persists with this argument even though he concedes that there has been an earlier federal vote buying prosecution under this statute in the Eleventh Circuit, United States v. McCranie, 169 F.3d 723 (11th Cir. 1999), as well as multiple such prosecutions in other Circuits.[3] (Doc. no. 40, p. 16). His argument fails.

According to Defendant, this Court is not bound by the decision in McCranie, *supra*, because "[t]he defendants there 'cite[d] no authority in support of their jurisdictional argument.'" (Id. (citing McCranie, 169 F.3d at 727)). Defendant dismisses the prior ruling as "little wonder" in light of the prior failure to cite authority in support of a jurisdictional

---

[3] Defendant acknowledges the following cases: United States v. Slone, 411 F.3d 643 (6th Cir. 2005); United States v. Cole, 41 F.3d 303 (7th Cir. 1994); United States v. Garcia, 719 F.2d 99 (5th Cir. 1983); and, United States v. Bowman, 636 F.2d 1003 (5th Cir. 1981). (Doc. no. 40, p. 16). Indeed, in concluding in the case that formed the basis for the decision in McCranie that § 1973i(c) applied to a mixed federal-state election where the federal candidates ran unopposed, this Court cited as supporting authority for its analysis Cole, Bowman, and Garcia, as well as United States v. Malmay, 671 F.2d 869 (5th Cir. 1982), United States v. Carmichael, 685 F.2d 903 (4th Cir. 1982), and United States v. Mason, 673 F.2d 737, 739 (4th Cir. 1982). See United States v. Jones, CR 397-006 (S.D. Ga. June 6, 1997), doc. no.46, *adopted by* doc. no. 59.

4

argument and takes the government to task for failing "to mention this important part of McCranie." (Doc. no. 40, p. 16; doc. no. 72, p. 7). The Court is unimpressed. Had the defense provided a complete description of McCranie, the briefing would have acknowledged that after pointing out that the defendants in McCranie had not cited any authority in support of their jurisdictional argument, the Eleventh Circuit stated (in the very next sentence), "**None exists**." McCranie, 169 F.3d at 727 (emphasis added). Thus, McCranie cannot simply be dismissed as a case that did not consider the jurisdictional implications of the statute because the defendants there did not make the argument. Rather, the argument was not made because, as the Eleventh Circuit stated, there was no authority to support such an argument.

Likewise, Defendant's argument concerning the statute's "plain text and the context in which this language is found," the legislative history of the statute, and the applicability of various canons of statutory construction misses the mark. (Doc. no. 40, pp. 4-16; doc. no. 72). In McCranie, the Eleventh Circuit twice commented on the plain/clear language of the vote buying statute prohibiting such actions in elections held "solely or in part" for electing federal candidates. "As a starting point, we observe that the federal vote buying statute, 42 U.S.C. § 1973i(c) . . . plainly prohibit[s] voting fraud 'in any general, special, or primary elections held solely *or in part* for the purpose of electing federal candidates." McCranie, 169 F.3d at 726. And again when discussing the Constitutional authority of Congress to regulate mixed elections, the Eleventh Circuit stated, "The language of § 1973i(c) . . . clearly gives us jurisdiction over elections held solely or in part for the purpose of selecting a candidate for the United States Congress." Id. at 727. Other courts have also recognized

the "clear and unambiguous" language of the vote buying statute as applying to a mixed federal-state election. Slone, 411 F.3d at 647; Mason, 673 F.2d at 739 (reciting the text of § 1973i(c) and immediately concluding that "the statute uncategorically proscribes payment or offers of payment for voting, whether in a purely federal election or a mixed federal/state election").

When, as here, statutory language is clear, the Eleventh Circuit has explained that the Court need not resort to the other rules of statutory construction and/or legislative history as proposed by Defendant:

> This Court has repeatedly stated that "[w]e begin our construction of [a statutory provision] where courts should always begin the process of legislative interpretation, and where they often should end it as well, which is with the words of the statutory provision." We have also said just as frequently that "[w]hen the import of words Congress has used is clear . . . we need not resort to legislative history, and we certainly should not do so to undermine the plain meaning of the statutory language." In other words, "[w]hen the words of a statute are unambiguous, then, this first canon [of statutory construction] is also the last: judicial inquiry is complete." The rule is that "we must presume that Congress said what it meant and meant what it said."
>
> The Supreme Court has similarly stated that "[g]iven a straightforward statutory command, there is no reason to resort to legislative history." Even where "[t]here are . . . contrary indications in the statute's legislative history . . . we do not resort to legislative history to cloud a statutory text that is clear." "We do not start from the premises that [the statutory] language is imprecise. Instead, we assume that in drafting legislation, Congress said what it meant."

CBS Inc. v. PrimeTime 24 Joint Venture, 245 F.3d 1217, 1222 (11th Cir. 2001) (internal citations omitted); see also Rine v. Imagitas, Inc., -F.3d-, No. 08-14880, 2009 WL 4893688, at *5 (11th Cir. Dec. 21, 2009); Price v. Time, Inc., 416 F.3d 1327, 1342 (11th Cir. 2005);

6

United States v. Rosario-Delgado, 198 F.3d 1354, 1357 & n.3 (11th Cir. 1999) (*per curiam*); United States v. Sepulveda, 115 F.3d 882, 886-87 & n.11 (11th Cir. 1997).

Thus, rather than accept Defendant's invitation to reach for alternative definitions of plain statutory text or delve into legislative history where no such fishing expedition is warranted, the Court will instead follow the clear command of the Eleventh Circuit and end its judicial inquiry with the plain meaning of the statutory text. 42 U.S.C. § 1973i(c) applies to mixed elections, such as the ones at issue in this case, which are "held solely or in part" for the purpose of voting on federal candidates. Therefore, Defendant's first argument for dismissal fails.

**B.     Charging Statute Is Constitutionally Sound.**

The fact that the plain meaning of the language of § 1973i(c) makes the statute applicable to the type of mixed federal-state elections at issue in this case does not put to rest Defendant's second argument for dismissal. According to Defendant, even if Congress did intend for the statute to apply to such mixed elections, then it exceeded its legislative authority, and the statute is therefore unconstitutional. As he did with his first argument concerning the applicability of the statute to mixed elections, Defendant appropriately concedes that courts have previously upheld Congressional authority to ban the vote buying alleged in this case based on the Necessary and Proper Clause of the Constitution. (Doc. no. 40, pp. 25-26). However, according to Defendant, the law has changed based on a series of cases from the Supreme Court interpreting the Elections Clause and the Commerce Clause. See, e.g., McConnell v. Federal Elections Comm'n, 540 U.S. 93, 187 (2003) (noting that the Supreme Court will "police[] the absolute boundaries of congressional power under Article

7

I" but also stating that "congress has a fully legitimate interest in . . . preventing corruption of federal electoral processes"), *overruled on other grounds*, Citizens United v. Federal Election Comm'n, - S. Ct. -, No. 08-205, 2010 WL 183856 (U.S. Jan. 21, 2010)[4]; Jones v. United States, 529 U.S. 848, 850-53 (2000) (finding that arson of a private residence was not covered by 18 U.S.C. § 844(i) because as applied to buildings not used for commercial purposes, statute exceeds Congressional authority under the Commerce Clause); United States v. Lopez, 514 U.S. 549, 551 (1995) (finding that Gun-Free School Zones Act, 18 U.S.C. § 922(q), was an unconstitutional exercise of Congressional authority under the Commerce Clause because no evidence that intrastate activities regulated by the Act had substantial effect on interstate commerce). The government counters that the constitutionality of § 1973i(c) has been upheld by the Eleventh Circuit after Lopez, and that another circuit has rejected federalism arguments like those now made by Defendant in a decision made after Lopez, Jones, and McConnell. (Doc. no. 58, pp. 4-5 (citing Slone, 411 F.3d at 649-50)). Once again, the government has the better argument.

Congress undisputably has the authority to regulate federal elections and to enact legislation which is "necessary and proper" to protect the federal elective system from violence, fraud, and corruption. Ex parte Yarbrough, 110 U.S. 651, 657-58, 661-62 (1884).

---

[4] Although specific portions of McConnell were overruled in Citizens United on the grounds that certain restrictions in the Bipartisan Campaign Reform Act of 2002 violated First Amendment protections of political speech, there are no such First Amendment issues in this case, and the general proposition that Congress has a legitimate interest in preventing corruption of federal electoral processes remains undisturbed.

Pursuant to its authority under Article 1, § 4, Clause 1,[5] and Article 1, § 8, Clause 18,[6] Congress passed the Voting Rights Act of 1965.[7] That language enacted § 1973i.

In United States v. Bowman, 636 F.2d 1003 (5th Cir. Unit A Feb. 1981), a jury convicted the defendant of conspiring to pay, and aiding and abetting other people to pay, persons to vote in a general election.[8] Bowman involved a vote buying scheme whereby "drivers" paid small amounts of money to voters to attain their vote for specific candidates, including a federal candidate, in a mixed federal-state election. Id. at 1009. However, the primary object of the scheme was the election of a local politician. In Bowman, the former Fifth Circuit ruled that "[t]he language of the statute is clear;" a specific intent to affect or otherwise impact a federal race on a ballot containing federal, state, and local races is not an element of 42 U.S.C. § 1973i(c). Id. at 1012. In so holding, the Bowman Court discussed Congress's authority to regulate federal elections and determined:

---

[5]The Elections Clause states: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing of Senators." Art. I, § 4, cl. 1.

[6]The Necessary and Proper Clause states that Congress shall have the power to "make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." Art. I, § 8, cl. 18.

[7]Interestingly, one of the cases upon which Defendant relies to support his current view of § 1973i, Blitz v. United States, 153 U.S. 308 (1894), interpreted an earlier version of a federal statute regulating elections, but the statutory language that was narrowly interpreted in Blitz was superseded by the Voting Rights Act of 1965, which as noted above, is the source of § 1973i. Slone, 411 F.3d at 647.

[8]In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions that were handed down prior to the close of business on September 30, 1981.

> under the Constitution, Congress may regulate "pure" federal elections, but not "pure" state or local elections; when federal and state candidates are together on the same ballot, Congress may regulate any activity which exposes the federal aspects of the election to the possibility of corruption, whether or not the actual corruption takes place and whether or not the persons participating in such activity had a specific intent to expose the federal election to such corruption or possibility of corruption.

Id. at 1011. The former Fifth Circuit further concluded that 42 U.S.C. § 1973i(c) "may be constitutionally applied to prohibit *any* activity that has the potential to affect the *integrity and purity* of a federal election where both federal and the state or local races are on the ballot . . ." Id. at 1012 (emphasis added). Although Bowman speaks in broad terms, Bowman explains that Congress has the power to preserve the *integrity* of the federal election as well as the final election result. Id. ("[T]he payment itself, not the purpose for which it is made, is the harm and the gist of the offense. With federal and state elections held on the same day and with all candidates listed on one ballot, it is impossible to isolate a threat to the integrity of the state electoral process from a threat to the integrity of the federal contest.").

In McCranie, the Eleventh Circuit re-iterated that the federal election fraud statutes "were implemented to protect two aspects of a federal election: the actual results of the election and the integrity of the process of electing federal officials." McCranie, 169 F.3d at 727. Indeed, the Eleventh Circuit concluded, "[T]he integrity of a mixed federal-state election is marred by fraudulent voting activities, even if these activities are only directed toward state elections." Id. (citing Cole, 41 F.3d at 306). Thus, taken in total, binding Eleventh Circuit case law points to but one conclusion: Congress, pursuant to its authority

to regulate and preserve the integrity of federal elections, has the power to proscribe the conduct alleged in the instant indictment.

Nevertheless, Defendant attempts to argue that a series of Supreme Court cases has somehow altered the landscape of the law on Congressional authority to regulate mixed elections.[9] According to Defendant, the Supreme Court's willingness to limit Congress's power by invalidating statutes like the Gun-Free School Zones Act in Lopez, *supra*, shows that § 1973i(c) is an unconstitutional exercise of Congressional authority. In particular, Defendant argues that the vote buying statute suffers from a similar problem as the Gun-Free School Zones Act, namely, "there is no way to determine on a case-by-case inquiry whether fraud within a state election contest has some, a little, or no effect on a federal contest contained on the same ballot." (Doc. no. 40, p. 24).

Notably, however, Defendant's argument on this point was already debunked by the Eleventh Circuit in McCranie, which was issued after Lopez. The McCranie court explained that the fraud allegedly directed to a state election need not affect or corrupt the outcome of the federal election, but rather the statute prohibits any activity that could potentially affect the "integrity and purity" of an election. McCranie, 169 F.3d at 727. Stated otherwise, the corruption of the election process is the ill that is addressed by the vote buying statute. Id. Defendant dismisses the fact that McCranie was handed down after Lopez on the theory that none of the lawyers in that case "were aware of this seminal Supreme Court decision" because they did not cite authority in support of their jurisdictional argument. (Doc. no. 72,

---

[9]Defendant relies primarily on Lopez, 514 U.S. 549 (2000), but as noted above, he also relies on, *inter alia*, McConnell, 540 U.S. 93 (2003), and Jones, 529 U.S. 848 (2000).

11

p. 7). Of course, as discussed above, the Eleventh Circuit specifically stated that no such authority existed. McCranie, 169 F.3d at 727. This Court does not presume, as Defendant apparently does, that the Eleventh Circuit was unaware of existing Supreme Court law at the time that it ruled "the Constitution's Necessary and Proper Clause, (Art. I, § 8, cl. 18), along with Art. I, § 4, empowers Congress to regulate mixed elections. . . ." Id. Moreover, Defendant's novel interpretation of a series of Supreme Court cases does not point to any specific language which would undermine the Eleventh Circuit's analysis that Congress properly regulates mixed elections not only to protect the actual elections results, but also "because the integrity of a mixed federal-state election is marred by fraudulent voting activities, even if these activities are only directed toward the state elections." Id.

The government also correctly points out that the Sixth Circuit, in a decision issued after Lopez, Jones, and McConnell, *supra*, rejected similar constitutional arguments. (Doc. no. 58, pp. 4-5 (citing Slone, 411 F.3d at 648-50)). In holding that § 1973i(c) falls within Congress's Article I authority, the Sixth Circuit rejected the argument "that Congress did not have the authority under the Elections Clause or the Necessary and Proper Clause to regulate conduct that affects only State or local elections." Id. at 648. Although the defendant in Slone, like Defendant here, relied heavily on Lopez, the court ruled that analogies to Commerce Clause jurisprudence were not persuasive on issues involving Congress's broader power under the Elections Clause.[10] Id. Citing McConnell, 540 U.S. 93, 187 (2003), the court observed that Congress is authorized to protect the integrity of federal elections under

---

[10]The Slone court also cited Bowman and McCranie, *supra*, in support of the proposition that Congress may regulate mixed federal-state elections. Slone, 411 F.3d at 649.

12

the Elections Clause and rejected the argument that a single-minded focus to impact a local race in an election where both federal and local candidates were on the ballot somehow removed the crime from Congressional purview. Id. at 649.

> To say that adulterating part of the election had no effect on the rest, however, is like saying that dumping pollution along the shore has no effect on the folks swimming in the middle of the lake. It is little comfort for them to say that the effluent may not reach into their space. Similarly, an election is a process whose fairness is meant to engender confidence in a democratically selected government. When the purity of the process is compromised in part, the corruption affects the integrity of the whole.

Id. at 649-50 (citing Bowman, 636 F.2d at 1012).

In sum, Defendant's second argument for dismissal based on the supposed unconstitutionality of the federal vote buying statute is without merit. He has presented nothing to disturb the binding precedent in place in this Circuit that holds that Congress is constitutionally authorized to regulate and protect the integrity of mixed federal-state elections. Therefore, Defendant's second argument for dismissal also fails.

### III. CONCLUSION

For the reasons set forth above, the Court **REPORTS** and **RECOMMENDS** that the "Motion to Dismiss" be **DENIED**. (Doc. no. 40).

SO REPORTED and RECOMMENDED this 29th day of January, 2010, at Augusta, Georgia.

_W. Leon Barfield_
W. LEON BARFIELD
UNITED STATES MAGISTRATE JUDGE